MS 09-6768 EJL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **AMENDED COMPLAINT** |
| PLAINTIFF, | |
| v. | |
| PROVIDENT ROYALTIES, LLC, a Delaware Limited Liability Company, PROVIDENT ASSET MANAGEMENT, LLC, a Delaware Limited Liability Company, PROVIDENT ENERGY 1, LP, a Texas Limited Partnership, PROVIDENT RESOURCES 1, LP, a Texas Limited Partnership, PROVIDENT ENERGY 2, LP, a Texas Limited Partnership, PROVIDENT ENERGY 3, LP, a Texas Limited Partnership, SHALE ROYALTIES II, INC., a Delaware Corp., SHALE ROYALTIES 3, LLC, a Texas Limited Liability Company, SHALE ROYALTIES 4, INC., a Delaware Corp., SHALE ROYALTIES 5, INC., a Delaware Corp., SHALE ROYALTIES 6, INC., a Delaware Corp., SHALE ROYALTIES 7, INC., a Delaware Corp., SHALE ROYALTIES 8, INC., a Delaware Corp., SHALE ROYALTIES 9, INC., a Delaware Corp., SHALE ROYALTIES 10, INC, a Delaware Corp., SHALE ROYALTIES 12, INC., a Delaware Corp., SHALE ROYALTIES 14, INC., a Delaware Corp., SHALE ROYALTIES 15, INC., a Delaware Corp., SHALE ROYALTIES 16, INC., a Delaware Corp., SHALE ROYALTIES 17, INC., a Delaware Corp., SHALE ROYALTIES 18, INC., a Delaware Corp., SHALE ROYALTIES 19, INC., a Delaware Corp., SHALE ROYALTIES 20, INC., a Delaware Corp., PAUL R. MELBYE, BRENDAN W. COUGHLIN, HENRY D. HARRISON and JOSEPH S. BLIMLINE, | Civil No.: 3-09CV1238-L  Judge: Sam A. Lindsay |
| DEFENDANTS, | |
| and | |
| SHALE ROYALTIES 21, INC., a Delaware Corp., SHALE ROYALTIES 22, INC.,  a Delaware Corp., PROVIDENT OPERATING COMPANY, LLC, a Texas Limited Liability Company, SOMERSET LEASE HOLDINGS, INC., a Texas Corp., SOMERSET DEVELOPMENT, INC., a Texas Corp., CAROLE PETROLEUM, LLC, a Texas Limited Liability Company, DANIEL AND THE LION, LLC, a Texas Limited | |

U.S. COURTS

DEC 1 4 2009

Rcvd_____Filed_____Time_____
CAMERON S. BURKE
CLERK, DISTRICT OF IDAHO

Certified a true copy of an instrument
on file in my office on _____ DEC - 9 2009
Clerk, U.S. District Court,
Northern District of Texas
By _____ Deputy

Liability Company, DEER VALLEY PRODUCTION
COMPANY, a Texas Corp., J2 INVESTMENTS, LLC, a
Texas Limited Liability Company,  MARQUEE
ENERGY, LLC, a Texas Limited Liability Company,
ARKOMA MINERAL PROPERTIES, INC., a Texas
Corp., NOVO ACQUISITIONS, LLC, a Texas Limited
Liability Company, RED RIVER OPERATORS, LLC, a
Texas Limited Liability Company, RJW ENERGY, LLC,
a Texas Limited Liability Company, SNAKE RIVER
RESOURCES, INC., a Texas Corp., SUN VALLEY
PRODUCTION COMPANY, a Texas Corp., TONNER
PETROLEUM, LLC, an Oklahoma Limited Liability
Company, TRULUCK ENTERPRISES, LLC, a Texas
Limited Liability Company, WINTER PARK
PRODUCTION COMPANY, LLC, a Texas Limited
Liability Company, PETROLEUM RESOURCE GROUP,
LLC, a Nevada Limited Liability Company, JORDAN
RIVER RESOURCES, INC., a Nevada Corp.,
COLUMBIA RIVER RESOURCES, INC., a Texas Corp.,
DELAWARE RIVER RESOURCES, INC., a Texas
Corp., REDSTONE ENERGY CORPORATION, a
Nevada Corp., SUPERIOR PETROLEUM
CORPORATION, a Nevada Corp., SOUTHWEST
ENERGY RESOURCES, INC., a Nevada Corp., PEACH
TREE PETROLEUM, INC., a Nevada Corp., APPLE
TREE RESOURCES, INC., a Nevada Corp., MIDWEST
DIVERSIFIED, LLC, a Nevada Limited Liability
Company, HURON HYDROCARBONS, INC., a Nevada
Corp., SHELF EXPLORATION AND PRODUCTION
GP, LLC, a Texas Limited Liability Company, OK
MINERALS, LLC, a Nevada Limited Liability Company,
NEW STAR PROPERTIES, LLC, a Nevada Limited
Liability Company, MESQUITE OIL AND GAS, LLC, a
Nevada Limited Liability Company, GREAT LAKES
ENERGY COMPANY, LLC, a Nevada Limited Liability
Company, and LONGHORN ENERGY
CORPORATION, a Nevada Corp.

**RELIEF DEFENDANTS.**

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## BACKGROUND

1.      From approximately September 2006 until January 2009, Provident Royalties, LLC ("Provident") solicited investments and sold preferred stock through a series of fraudulent private placement offerings.  Provident raised approximately $485 million from at least 7,700 investors nationwide.  Provident promised high returns and misrepresented how investor funds would be used.  Although a portion of the proceeds of the offerings were used for the acquisition and development of oil and gas exploration and development activities, investor funds were also commingled and investor funds raised in later offerings were used to pay "dividends" and "returns of capital" to earlier Provident investors

2.      Provident and its principals made material misrepresentations to investors in order to induce individuals to purchase preferred stock or limited partnership interests in the Provident private placement offerings.  Investors were told that 86 percent of their funds would be placed in oil and gas investments.  That representation was false.  Investors were not told that their funds would be commingled with funds derived from the other private placement offerings and that the proceeds from later private placement offerings would be used to pay promised returns to earlier investors.

3.      By the conduct detailed in this Complaint, Defendants, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Unless enjoined, Defendants are likely to commit such violations again.  The Relief Defendants hold assets, funds, or other properties derived from the fraudulent offering and should be required to disgorge those assets.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction over this action under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

5.     Defendants, directly or indirectly, used the means or instruments of interstate commerce, the mails, or the facilities of a national securities exchange in connection with the acts described herein.

6.     Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of business occurred within this judicial district.

## DEFENDANTS

7.     **Provident Royalties, LLC ("Provident")** is a Delaware limited liability company with its principal office in Dallas, Texas.  Provident is owned by three entities.  The majority of the interests in Provident are held by two companies, which include WPCO, LLC, an affiliate of Paul R. Melbye ("Melbye"), and HHBC Enterprise LP, an affiliate of Brendan W. Coughlin ("Coughlin") and Henry D. Harrison ("Harrison").  Provident was to acquire a combination of producing and non-producing sub-surface mineral interests, working interests and production payments in real property located within the United States.  Provident is a beneficial owner in each of the numerous affiliated entities, which offered and sold preferred stock or limited partnership interests to investors.  Provident is not registered with the Commission.

8.     **Provident Asset Management, LLC ("PAM")** is a Delaware limited liability company which has been registered with the Commission as a broker-dealer since March 9,

4

2004.  Coughlin and Harrison are the principals of PAM.  PAM's principal office is in Dallas, Texas.

9.     **Provident Rule 506 Entities** are a series of business entities through which Provident and PAM raised funds from investors.  All of the entities maintain their headquarters in Provident's offices in Dallas, Texas.  The entities, an estimate of funds raised and the approximate number of investors is as follows:

(a) **Provident Energy 1, LP** is a Texas limited partnership which raised approximately $7.2 million from 131 investors.

(b)     **Provident Resources 1, LP** is a Texas limited partnership which raised approximately $9.1 million from 214 investors.

(c)     **Provident Energy 2, LP** is a Texas limited partnership which raised approximately $25.9 million from 498 investors.

(d)     **Provident Energy 3, LP** is a Texas limited partnership which raised approximately $120,000 from four investors.

(e)     **Shale Royalties II, Inc.,** is a Delaware corporation which raised approximately $9.7 million from 177 investors.

(f)     **Shale Royalties 3, LLC** is a Texas limited liability company which raised approximately $20 million from  339 investors.

(g)     **Shale Royalties 4, Inc.,** is a Delaware corporation which raised approximately $27.4 million from 487 investors.

(h)     **Shale Royalties 5, Inc.,** is a Delaware corporation which raised approximately $29.94 million from 499 investors.

(i)     **Shale Royalties 6, Inc.,** is a Delaware corporation which raised

approximately $27.4 million from 493 investors.

(j)      **Shale Royalties 7, Inc.,** is a Delaware corporation which raised approximately $31.3 million from 494 investors.

(k)      **Shale Royalties 8, Inc.,** is a Delaware corporation which raised approximately $31.8 million from 497 investors.

(l)      **Shale Royalties 9, Inc.,** is a Delaware corporation which raised approximately $33.2 million from 499 investors.

(m)      **Shale Royalties 10, Inc.,** is a Delaware corporation which raised approximately $29.1 million from 496 investors.

(n)      **Shale Royalties 12, Inc.,** is a Delaware corporation which raised approximately $34.9 million from 488 investors.

(o)      **Shale Royalties 14, Inc.,** is a Delaware corporation which raised approximately $31.1 million from 446 investors.

(p)      **Shale Royalties 15, Inc.,** is a Delaware corporation which raised approximately $27.5 million from 458 investors.

(q)      **Shale Royalties 16, Inc.,** is a Delaware corporation which raised approximately $31.2 million from 466 investors.

(r)      **Shale Royalties 17, Inc.,** is a Delaware corporation which raised approximately $30.5 million from 492 investors.

(s)      **Shale Royalties 18, Inc.,** is a Delaware corporation which raised approximately $24.4 million from 306 investors.

(t)      **Shale Royalties 19, Inc.,** is a Delaware corporation which raised approximately $12.2 million from 194 investors.

(u)    **Shale Royalties 20, Inc.,** is a Delaware corporation which raised approximately $6.8 million from 91 investors.

10.    **Paul R. Melbye ("Melbye"),** age 44, a Dallas, Texas resident, is a founder and manager of Provident.  Melbye is a principal of each Provident Rule 506 Entity, and is the principal in charge of operations for Provident.  Melbye was a control person of Provident

11.    **Brendan W. Coughlin ("Coughlin"),** age 43, a Dallas, Texas resident, is a founder and manager of Provident.  Coughlin is also a managing partner of PAM, and a principal of each Provident Rule 506 Entity.

12.    **Henry D. Harrison ("Harrison"),** age 44, a Dallas, Texas resident, is a founder and manager of Provident.  Harrison is also a managing partner of PAM, and a principal of each Provident Rule 506 Entity.

13.    **Joseph Blimline ("Blimline"),** age 34, a Dallas, Texas resident was a founder and manager of Provident. At times, Blimline acted as a manager, employee and consultant to Provident.  In 2006, the State of Michigan imposed a cease and desist order against Blimline for the sale of unregistered securities.  That disciplinary action was deliberately concealed from purchasers of Provident's securities.

## RELIEF DEFENDANTS

14.    **Somerset Lease Holdings, Inc. ("Somerset")** is a Texas corporation and is a wholly-owned subsidiary of Provident.  It was established to primarily hold properties owned by certain of the Provident Rule 506 Entities including Shale Royalties II, Inc., Shale Royalties 3, LLC, Shale Royalties 4, Inc., Provident Energy 1, LP, and Provident Resources 1, LP.

15. **Somerset Development, Inc. ("Development")** is a Texas corporation and is a wholly-owned subsidiary of Provident. It was established to hold properties owned by certain of the Provident Rule 506 Entities.

16. **Provident Operating Company, LLC,** is a Texas limited liability company, is a wholly-owned subsidiary of Provident and is used for well operations.

17. **Shale Royalties 21, Inc.,** is a Delaware corporation which received approximately $15,000 in seed money from Provident.

18. **Shale Royalties 22, Inc.,** is a Delaware corporation which received approximately $15,000 in seed money from Provident.

19. **Carole Petroleum, LLC ("Carole"),** is a Texas limited liability company.

20. **Daniel and the Lion, LLC ("Daniel"),** is a Texas limited liability company.

21. **Deer Valley Production Company ("Deer Valley"),** is a Texas corporation.

22. **J2 Investments, LLC ("J2")** is a Texas limited liability company.

23. **Marquee Energy, LLC ("Marquee"),** is a Texas limited liability company.

24. **Arkoma Mineral Properties, Inc. ("Arkoma"),** is a Texas limited liability company.

25. **Novo Acquisitions, LLC ("Novo"),** is a Texas limited liability company.

26. **Red River Operators, LLC ("Red River"),** is a Texas limited liability company.

27. **RJW Energy, LLC ("RJW"),** is a Texas limited liability company.

28. **Snake River Resources, Inc. ("Snake River"),** is a Texas corporation.

29. **Sun Valley Production Company ("Sun Valley"),** is a Texas corporation.

30. **Tonner Petroleum, LLC ("Tonner"),** is an Oklahoma limited liability company.

31. **Truluck Enterprises, LLC ("Truluck"),** is a Texas limited liability company.

32.     **Winter Park Production Company, LLC ("Winter Park"),** is a Texas limited liability company.

33.     **Petroleum Resource Group, LLC ("Petroleum Resources"),** is a Nevada limited liability company.

34.     **Jordan River Resources, Inc. ("Jordan River"),** is a Nevada corporation.

35.     **Columbia River Resources, Inc. ("Columbia River"),** is a Texas corporation.

36.     **Delaware River Resources, Inc. ("Delaware River"),** is a Texas corporation.

37.     **Redstone Energy Corporation ("Redstone"),** a Nevada corporation.

38.     **Superior Petroleum Corporation ("Superior"),** is a Nevada corporation.

39.     **Southwest Energy Resources, Inc. ("Southwest"),** is a Nevada corporation.

40.     **Peach Tree Petroleum, Inc. ("Peach Tree"),** is a Nevada corporation.

41.     **Apple Tree Resources, Inc. ("Apple Tree"),** is a Nevada corporation.

42.     **Midwest Diversified, LLC ("Midwest"),** is a Nevada limited liability company.

43.     **Huron Hydrocarbons, Inc. ("Huron"),** is a Nevada corporation.

44.     **Shelf Exploration and Production GP, LLC ("Shelf"),** is a Texas limited liability company.

45.     **OK Minerals, LLC ("OK Minerals"),** is a Nevada limited liability company.

46.     **New Star Properties, LLC ("New Star")** is a Nevada limited liability company.

47.     **Mesquite Oil and Gas, LLC ("Mesquite")** is a Nevada limited liability company.

48.     **Great Lakes Energy Company, LLC ("Great Lakes"),** is a Nevada limited liability company.

49.     **Longhorn Energy Corporation ("Longhorn"),** is a Nevada Corporation.

50.     Relief defendants numbered nineteen through forty-nine are a series of companies operated and controlled by Blimline which have received money or real property or sold assets or real property to Provident or its affiliated entities.  Collectively these entities will be referred to as the "Blimline entities."

## STATEMENT OF FACTS

### PROVIDENT'S OFFERING OF SECURITIES

51.     Beginning in or about September 2006, Provident began a series of offerings by 21 affiliated corporations and limited partnerships which offered and sold limited partnership interests or preferred stock to the public through a number of broker-dealers nationwide.

52.     Provident is a company which holds oil and gas interests, working interests and royalty interests in oil and gas properties in the United States.

53.     The Provident Rule 506 Entities each claimed an exemption from the registration of its securities pursuant to Rule 506 of Regulation D of the federal securities laws.

54.     The Provident Rule 506 Entities denominated as Shale Royalties, Inc., numbered II through 20, offered two series of non-convertible redeemable cumulative preferred stock.  Each share of stock was offered for $5,000 through a Private Placement Memorandum ("PPM").

55.     At the outset of the Rule 506 offerings by Provident, dividends on each share of Series A preferred stock were to accrue at the rate of 1.5% per month.  Dividends on each share of Series B preferred stock were to accrue at the rate of 1.25% per month.

56.     Provident Energy 1, Provident Energy 2 and Provident Energy 3 offered $5000 units with a minimum investment of $25,000.  The PPMs for these entities provided that "the limited partners and investor general partners will receive 95% of net cash flow until payback. After payback, the investors will receive 50% of net cash flow."

57.     Provident Resources 1, LP offered $5000 units with a minimum investment of $25,000. The PPM for this entity provided that "purchasers of units in the partnership will participate in profits and losses and distributions as follows: 85% to the Investor Partners before Payout and 15% to the Managing Partner before Payout, 30% to the Investor Partners after Payout and 65% to the Managing partner after payout and 5% to Okoboji Financial after Payout.

58.     At some point in time, Provident reduced the amount payable for dividends on Series A preferred stock to 1.375% and on Series B preferred stock to 1.167%. At the same time, the PPMs for these Provident Rule 506 Entities changed the terms to 48 months for Class A Preferred Shares and 36 months for Class B Preferred Shares.

59.     Dividends were to be paid four months in arrears, and then monthly on the last day of each month.

60.     Series A preferred stock was redeemable at the end of 24 or 36 months and Series B preferred stock at the end of 24 months.

61.     Other affiliated entities of Provident with Rule 506 offerings included Provident Energy 1, LP, Provident Energy 2, LP, Provident Energy 3, LP, and Provident Resources 1, LP. These entities offered limited partnership interests on substantially the same terms as the other Provident Rule 506 Entities.

62.     The offerings by the Provident Rule 506 Entities were virtually identical in their terms, had the same investment purpose, and took place continuously over a 30 month period. The periods of many of the offerings overlapped others.

63.     Provident limited each offering to 500 investors and to varying dollar amounts, and as an offering would approach one of those limits, the next Provident Rule 506 Entity would be created.

64. Provident offered its interests through PPMs for each 506 offering.

65. These PPMs were distributed to wholesale brokers, retail broker-dealers, registered representatives and investors.

### PROVIDENT'S SALES EFFORTS

66. PAM invited numerous broker-dealers, registered representatives and prospective investors to their offices to present sales presentations for the Rule 506 offerings.

67. In these presentations and in the PPMs, Coughlin, Harrison, Melbye and Blimline touted their relationship with Sinclair Oil Company ("Sinclair"), an established oil and gas exploration and development company.

68. Coughlin, Harrison, Melbye and Blimline attended many of these presentations, forwarding a glowing picture of the company through a PowerPoint demonstration.

69. In the PowerPoint demonstration, Coughlin, Harrison, Melbye and Blimline used the Sinclair Oil Company logo and characterized Sinclair as Provident's "industry partner."

70. In fact, Sinclair had never authorized Provident to use its name, its logo and only maintained a business relationship with Provident. Sinclair had entered into an exploration agreement with Provident and was the guarantor on loans Provident obtained from third parties.

71. Funds obtained from Sinclair directly, or from the proceeds of the loans guaranteed from Sinclair were supposed to be used only for the acquisition of properties within a specific geographic area.

72. Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing that Sinclair had not authorized Provident to use its name in securities offering documents or other promotional materials.

73.     Investors would have found it important to know that Sinclair had not authorized the use of its name in connection with the offering of securities by Provident.

74.     PAM paid the expenses of the broker-dealers and others who visited Provident for these sales presentations.

75.     The Rule 506 preferred stock was underwritten by PAM on a best efforts basis as a managing dealer under a placement agreement with each Rule 506 Entity.

76.     PAM made some direct retail sales of securities through the Rule 506 offerings.

77.     PAM solicited retail broker-dealers to enter into placement agreements for each Rule 506 offering, and those retail broker-dealers sold the stock of the Provident Rule 506 to retail investors nationwide.

78.     Provident deposited the proceeds from the offerings into a bank account for the Provident Rule 506 Entity in which the investor purchased stock or a limited partnership interest.

79.     Prior to July 2008, money moved freely from one Provident Rule 506 Entity account to another as required for the payment of dividends or to fund operations.

80.     After July 2008, invested funds were initially deposited into the account for the Provident Rule 506 Entity in which the investor purchased securities and then was swept into one of Provident's operating accounts.

81.     During the period of the offerings by the Provident Rule 506 Entities, the offerings raised approximately $485 million from more than 7,700 investors.

82.     None of the Provident Rule 506 Entities had audited financial statements.

83.     In its offering documents for the Provident Rule 506 Entities and communications with investors, Provident represented the following:

13

    a.   Investors were told that their investment would be used by each Individual Provident Rule 506 Entity to purchase oil and gas assets for that corresponding entity.

    b.   The proceeds of each offering were to be deposited into an account of the corporation and become assets of the corporation.

    c.   Typically, investors were told that approximately 86% of the subscription proceeds were to be allocated to oil and gas investments.

    d.   Dividends were to be paid from revenues, primarily from the sale of assets.

84.    Investors were told by Provident representatives that the proceeds of one Rule 506 offering would not be used for the payment of dividends in another offering.

85.    Cash reports were provided to Melbye and Blimline on a daily basis. These daily cash reports reflected the available cash balances in each Provident account.

86.    Beginning at least in April 2008, Provident moved cash from one Shale Royalties account to another Shale Royalties account. This movement of funds was approved by Coughlin, although Melbye and Blimline were provided with the cash reports which reflected this transfer of funds.

87.    In or around June 2008, some of the Shale Royalties entities did not have sufficient cash to pay dividend payments to investors. In order to meet the dividend payment obligations, funds were transferred from two Shale Royalties accounts, into Provident's general operating account, and then into the Shale Royalties entities which were obligated to pay investor dividends.

88.    Similar transfers were made in July, August, September, October and December of 2008.

89.     These transfers were characterized by Provident's accounting department as "loans" but there was no documentation for the loans; there were no terms attached to the loans, and there were no procedures in place to insure that these "loans" were repaid.

90.     Similarly, transfers from the Shale entities to Provident for payment of overhead or operating expenses were not adequately documented, there were no terms attached to the transfers; and, there were no procedures in place to insure that these "loans" were repaid.

91.     Provident also used funds obtained from Sinclair in order to pay investor dividends.

92.     Provident announced that it would cease accepting new investors into any of the open Rule 506 offerings on or about January 22, 2009.

93.     Provident suspended dividend payments for all of the Rule 506 Entities on or about January 29, 2009.  Provident has not paid any dividends since that date.

94.     Investors were not told, and the Private Placement Memoranda do not disclose, that their investments would be used to pay earlier investors their dividends and return of principal, rather than being invested in oil and gas assets.

95.     Investors would have found it important to know that their funds were not being invested as represented in the Rule 506 offering materials and that their funds were being used to repay earlier investors.

96.     Blimline, Melbye, Harrison and Coughlin knew, or were reckless in not knowing that that Provident did not have sufficient revenues to pay investors their dividends.

97.     Melbye, Harrison and Coughlin were officers, directors or managers of the Provident Rule 506 Entities and were signatories in the bank accounts of those entities.

98.     Blimline, Melbye, Coughlin and Harrison knew, or were reckless in not knowing, that the Provident Rule 506 Entities did not have a successful track record of earning sufficient revenues to pay investors or to redeem the preferred stock without raising capital from additional investors.

99.     Blimline, Coughlin, Harrison and Melbye knew, or were reckless in not knowing, that Provident's internal accounting controls were lax permitting the commingling of funds, the transfer of funds from one entity to another and the transfer to Blimline or his entities with virtually no documentation.

**BLIMLINE AND PROVIDENT**

100.     Blimline acted as an officer, employee, agent and/or consultant for Provident and Provident's affiliates.

101.     Blimline claimed that he had expertise in the oil and gas industry and would assist Coughlin, Harrison and Melbye in identifying and acquiring oil and gas assets on behalf of Provident.

102.     Blimline claimed that he could locate prospective oil and gas interests in targeted areas, provide the title work thereon and ultimately acquire such interests on behalf of Provident at a fair and reasonable price.

103.     This claim was false.  In fact, the land acquisition by Blimline was neither strategically targeted nor acquired at a fair and reasonable price.  In many cases, there was no land or mineral acquisition at all.

104.     Blimline, Coughlin, Harrison, and Melbye knew, or were reckless in not knowing, that all funds transferred to Blimline or entities controlled by him would be used for the acquisition of oil and gas interests on behalf of Provident and the Shale entities.

105.     Blimline, Coughlin, Harrison and Melbye knew, or were reckless in not knowing, that investors were informed that at least 86% of the funds provided to the Shale entities and Provident were to be used to purchase oil and gas interests.

106.     Blimline obtained funds from Provident by simply supplying Provident with a "purchase order" or PO.  Acting upon Blimline's instructions, Provident's accounting department would transfer funds to Blimline, ostensibly to acquire oil and gas interests, with little, if any, documentation of the purpose of the transfers.

107.     Provident, through the Shale entities and otherwise, advanced tens of millions of dollars to Blimline and his entities for the purported purchase of oil and gas interests for which Blimline and his entities have never, or only belatedly, provided Provident title documents evidencing the interests purchased.

108.     Blimline has delivered numerous "assignments" of oil and gas interests to Provident only after the commencement of this action by the Commission and appointment of a receiver.  These putative assignments represent oil and gas interests that have vastly diminished in value due to Blimline's delay in delivering the appropriate documents evidencing Provident's purchase of the oil and gas interests.

109.     Blimline often received duplicate payments for the same property.  Only rarely were these duplicate payments returned to Provident.

110.     Blimline acquired properties on behalf of Provident at prices far greater than the fair market value of the properties.  In many instances, Blimline charged Provident a higher price than he actually paid for the properties.

111.     Beginning in December 2007, Blimline obtained more than $20 million in loans from Provident.  The loans were supposedly short term and were for no stated purpose.

Coughlin, Harrison and Melbye knew that Blimline was borrowing this money, often executing the putative purchase order or loan documents.

112.   Blimline ostensibly repaid some of the loans.  The so-called loan repayments, however, were simply made with Provident funds loaned to him at a later date.

113.   Blimline obtained funds easily and with little or no documentation because there were virtually no internal accounting controls at Provident.

114.   As set forth above, funds were transferred to Blimline, his entities, among Shale entities and to Provident Royalties with minimal requirements.

115.   Large sums of funds were transferred to Blimline and his entities with virtually no documentation, at the express direction of Coughlin, Harrison, Melbye and Blimline himself.

116.   Provident advanced funds to Blimline for the purchase of a number of ranches in Oklahoma, properties which included surface and mineral interests.

117.   Despite being paid by Provident for the properties in their entirety, Blimline transferred only the mineral interests to Provident, while keeping the surface interests in the name of his own entities.

118.   Blimline has recently begun to strip the equity from these ranches by mortgaging the surface interests and transferring the proceeds of the mortgages to other entities controlled by him.

119.   In 2005, Blimline was an officer and director of a Nevada corporation which offered and sold securities in the State of Michigan.  On or about March 13, 2006, Blimline was ordered by the State of Michigan, Department of Labor and Economic Growth, Office of Financial and Insurance Services to cease and desist from offering unregistered securities to

residents of Michigan.  Blimline was ordered to pay a civil penalty in the amount of $1,000 and was ordered to comply with the provisions of the Michigan Uniform Securities Act.

120.    Coughlin, Harrison and Melbye knew that Blimline had been charged and disciplined by the Michigan securities authorities.  Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing, that the Michigan action had not been disclosed to investors in the PPMs or otherwise.

121.    Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing, that Provident had made unsecured loans to Blimline and these loans had not been repaid.

122.    Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing, that Provident had made duplicate payments to Blimline or his entities and had not been repaid for these duplicate payments.

123.    Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing, that Provident had advanced to Blimline funds totaling millions of dollars in excess of the contract price of certain interests purchased by Blimline on Provident's behalf.

124.    Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing, that virtually all of the oil and gas interests purportedly purchased by Defendants were purchased at a price grossly inflated above market value.

125.    Investors and other third parties would have found it important to know that a principal of Provident had been previously charged with securities violations.

126.    Investors and other third parties would have found it important to know that Provident had made unsecured loans to Blimline and had not been repaid.

127.    Investors and other third parties would have found it important to know that Provident had made duplicate payments to Blimline and his entities and had not been repaid.

128.     Investors and other third parties would have found it important to know that Blimline had requested, and Provident had advanced, funds totaling millions of dollars in excess of the contract price of certain interests purchased on Provident's behalf.

129.     Investors and other third parties would have found it important to know that virtually all of the oil and gas interests purportedly purchased by Blimline and his entities were purchased at a price grossly inflated prices above market value.

## PROVIDENT FAILED TO SELL ANY ASSETS

130.     Provident, through the PPMs, consistently represented to investors that it was going to aggregate oil and gas interests and sell them to third parties at a significantly higher prices in order to pay investor dividends, Provident's expenses, and redeem investments.

131.     Provident engaged third parties in order to market and sell its assets to other oil and gas companies.

132.     Beginning in the spring of 2008, these third parties assembled packages of oil and gas interests to market and sell to third parties.  At first, Provident attempted to sell a large number of oil and gas interests in a single sale.  When that failed, Provident broke up the assets into a number of packages and marketed these individual packages of oil and gas interests to third parties.

133.     Despite significant marketing efforts, Provident failed to sell any material amount of oil and gas interests to third parties.

134.     One of the reasons that Provident failed to sell any properties was because of a high rate of failed titles.  Provident could not demonstrate to third parties that it actually held clear title to a significant number of the oil and gas interests that it was attempting to sell.

135.     By August of 2008, Provident abandoned attempts to market and sell packages of oil and gas interests because of the title issues.

136.     Despite learning that there were significant title issues with the properties that it claimed to own, Provident continued to market its securities to investors until January of 2009.

137.     Provident did not disclose that it had discovered that the title to a significant number of oil and gas interests was impaired.

138.     Provident, Coughlin, Harrison, Melbye and Blimline knew, or were reckless in not knowing, that Provident had significant problems with its title to assets it claimed to own.

139.     Investors and other third parties would have found it important to be informed that Provident had significant title issues with properties that it claimed to own.  Investors and other third parties would have found it important to be informed that third parties were unwilling to purchase assets from Provident because of these title problems.

**FIRST CLAIM**

**FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES**
**Violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5**
**[17 C.F.R. § 240.10b-5]**

140.     The Commission realleges and incorporates by reference the allegations contained in paragraphs 1 through 139.

141.     Defendants, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices or courses of business that operated or would operate as a fraud or deceit.

142.     Defendants' representations and omissions were material.

143.     By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### EMPLOYMENT OF A DEVICE, SCHEME OR ARTIFICE TO DEFRAUD
### Violation of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

144.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 139, above.

145.     Defendants, and each of them, by engaging in conduct described in Paragraphs 1 though 139, above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

146.     By reason of the foregoing, Defendants, directly or indirectly, violated, and unless restrained and enjoined by this Court, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## THIRD CLAIM

### FRAUD IN THE OFFER AND SALE OF SECURITIES

### Violations of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)]

147.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 139, above.

148.     Defendants, and each of them, by engaging in the conduct described in Paragraphs 1 through 139, above, directly and indirectly, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by

omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

149.     By reason of the foregoing, Defendants, and each of them, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## FOURTH CLAIM

### UNJUST ENRICHMENT

150.     The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 though 139, above.

151.     As a result of the unlawful conduct of Defendants, Relief Defendants have thus been unjustly enriched, and it would be unjust and inequitable for them to retain those funds and/or property.

## REQUEST FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged herein.

### II.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders that preliminarily and permanently enjoin Defendants, and their officers agents, servants,

employees, attorneys, and accountants, and those persons in active concert or participation with

any of them, who receive actual notice of the order by personal service or otherwise, and each of

them, from engaging in transactions, acts, practices, and courses of business described herein,

and from engaging in conduct of similar purport and object in violation of Section 17(a) of the

Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### III.

Issue, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure,

orders that temporarily, preliminarily and permanently enjoin Defendants and Relief Defendants,

and their officers, agents, servants, employees, attorneys, and accountants, and those persons in

active concert or participation with any of them, who receive actual notice of the order by

personal service or otherwise, and each of them, from:  (A) transferring, changing, wasting,

dissipating, converting, concealing, or otherwise disposing of, in any manner, any funds, assets,

claims, or other property or assets owned or controlled by, or in the possession or custody of

these Defendants and/or Relief Defendants; and (B) transferring, assigning, selling,

hypothecating, or otherwise disposing of any assets of Provident, PAM, the Provident Rule 506

Entities, Melbye, Coughlin, Harrison or Blimline.

### IV.

Issue in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure orders

that temporarily, preliminary and permanently restrain and enjoin Defendants, and each of them,

and their officers, agents, servants, employees, attorneys, and accountants, and those persons in

active concert or participation with any of them, who receive actual notice of the order by

personal service or otherwise, and each of them, from destroying, mutilating, concealing,

transferring, altering, or otherwise disposing of, in any manner, books, records, computer

programs, computer files, computer printouts, correspondence, including e-mail, whether stored electronically or in hard-copy, memoranda, brochures, or any other documents of any kind that pertain in any manner to the business of the Defendants.

## V.

Bar defendants Blimline, Coughlin, Harrison and Melbye from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, as amended [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VI.

Enter an order directing Defendants, and each of them, to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act.

## VII.

Enter an order directing Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains.

## VIII.

Declare and impose a constructive trust on all property received by Relief Defendants and require them to disgorge the property they obtained from Defendants as a result of the illegal conduct alleged herein.

## IX.

Grant such further equitable relief as this Court deems just, appropriate, and necessary, including, but not limited to, a freeze of assets and the acceleration of discovery, including the forthwith production of documents.

## X.

Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all

orders and decrees that may be entered, or to entertain any suitable application or motion for

additional relief within the jurisdiction of this Court.

Dated this 3rd day of December, 2009.

Respectfully submitted,

/s/ Thomas M. Melton
Thomas M. Melton (Utah Bar No. 4999)
meltont@sec.gov
Karen L. Martinez (Utah Bar No. 7914)
martinezk@sec.gov
Paul N. Feindt (Utah Bar No. 8769)
feindtp@sec.gov
Attorneys for Plaintiff
Securities and Exchange Commission
15 West South Temple, Suite 1800
Salt Lake City, Utah 84101
Tel.  801-524-5796
Fax  801-524-5262

Local Counsel
Toby M. Galloway (Texas Bar No. 00790733)
gallowayt@sec.gov
Securities and Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
Tel. 817-978-6447
Fax  817-978-4927

CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of December, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Patrick K. Craine
patrick.craine@bgllp.com
Terence J. Hart
terry.hart.@bgllp.com
Bracewell & Guiliani, LLP
1445 Ross Avenue, Suite 3800
Dallas, TX 75202
*Attorneys for Defendant Paul R. Melbye*

John H. Carney
jcarney@johnhcarney.com
William M. Ravkind
bravkind@johnhcarney.com
Ravkind & Associates
One Meadows Building
5005 Greenville Avenue, Suite 200
Dallas, TX 75206
*Attorneys for Defendants Brendan W. Coughlin and Henry D. Harrison*

Jeffrey Scott Osgood
jeffrey.osgood@strasburger.com
Melody K. Smith
melody.smith@strasburger.com
Strasburger & Price, LLP
PO Box 50100
901 Main Street, Suite 4400
Dallas, TX 75202
*Attorneys for Movant Strasburger & Price, LLP*

Jason Bradley Binford
jason.binford@haynesboone.com
Sarah Burrell Foster
sarah.foster@haynesboone.com
Haynes & Boone
2323 Victory Avenue, Suite 700
Dallas, TX 75219

Dennis L. Roossien
droossien@munsch.com
Steven A. Harr
sharr@munsch.com
James M. McGee
jmcgee@munsch.com
Munsch Hardt Kopf & Harr, PC
3800 Lincoln Plaza
500 N. Akard Street
Dallas, TX 75201
*Court-appointed Receiver*

Slates C. Veazey
sveazey@gardere.com
Daniel C. Scott
dcscott@gardere.com
Holly Neff O'Neil
honeil@gardere.com
Joanee Early
jearly@gardere.com
Richard M. Roberson
rroberson@gardere.com
Gardere Wynne Sewell, LLP
3000 Thanksgiving Tower
1601 Elm Street, Suite 3000
Dallas, TX 75201-4761
*Attorneys for Intervenor Official Committee of Unsecured Creditors*

Josefina Fernandez McEvoy
Sarah Korobkin
Fox Rothschild, LLP
1800 Century Park East, Suite 300
Los Angeles, CA 90067-1506
jfmcevoy@foxrothschild.com
skorobkin@foxrothschild.com

Michael R. Rochelle
Rochelle McCullough, LLP
325 North Sain Paul, Suite 4500
Dallas, TX 75201
Buzz.rochelle@romclawyers.com
*Attorneys for The Official Investors Committee of Provident Royalties, LLC.*

/s/ Marie Elliott_____

29